**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHARLENE S. SCHMITZ,** | ) | |
|     **Petitioner** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 07-00365-KD-N** |
| | ) | **CIVIL NO. 10-00500-KD-N** |
| **UNITED STATES OF AMERICA,** | ) | |
|     **Respondent.** | ) | |

**UNITED STATES'S RESPONSE IN OPPOSITION TO
MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE**

Comes now the United States of America, by and through Kenyen R. Brown, the United States Attorney for the Southern District of Alabama, and responds to defendant Charlene Schmitz's 28 U.S.C. § 2255 motion to vacate, set aside, or correct sentence. Schmitz raises three grounds, each encompassing numerous claims and sub-claims: (1) prosecutorial misconduct; (2) ineffective assistance of counsel; and (3) judicial abuse of discretion. The prosecutorial misconduct ground is procedurally defaulted, the judicial abuse of discretion ground is patently frivolous, and all of the remaining claims are without merit. They are therefore due to be denied, as explained below.

## I.  PROCEDURAL HISTORY

After a jury trial, Schmitz was convicted of two counts of using a facility of interstate commerce to entice a minor to engage in sexual activity for which a person may be charged with a criminal offense, in violation of 18 U.S.C. § 2422(b). Doc. 72. This Court sentenced Schmitz to 121 months' imprisonment as to each count, to run concurrently. Doc. 97. Judgment was entered on June 18, 2008, Doc. 97, and a notice of appeal was filed. Doc. 95. The Eleventh

Circuit Court of Appeals affirmed on April 6, 2009, finding that the evidence was sufficient to support the conviction. Doc. 119. Schmitz filed a petition for a writ of *certiorari* and moved for leave to proceed *in forma pauperis*, but the Supreme Court denied the *in forma pauperis* motion on October 20, 2009, *see Schmitz v. United States*, 130 S. Ct. 484 (Oct. 20, 2009), *reconsideration denied*, 130 S. Ct. 1038 (Dec. 14, 2009), giving her 21 days (until November 10, 2009) to pay the normal docket fees and submit a petition in accordance with Sup. Ct. R. 33.1. She failed to do so. *See* Doc. 124 at 2.

Schmitz filed her § 2255 motion on September 9, 2010. Doc. 127. It asserted three grounds for relief, but did so in a quite vague and perfunctory manner. Specifically, Schmitz alleged (1) "prosecutorial misconduct which violates the Fifth Amendment under due process," (2) "ineffective assistance of counsel which violates the Sixth Amendment," and (3) "Judicial abuse of discretion, errors, bias, and favoritism, which violates the Fifth and Sixth Amendments." *Id.* at 4-5. The factual background section for each of these three claims referred to a forthcoming "Memorandum of Points & Authorities in Support of this motion." *Id.* But no such memorandum was filed in conjunction with the motion. Instead, she filed three separate and voluminous supporting memoranda – one for each of her three grounds. *See* Docs. 136, 139, and 140 (comprising over 200 pages in length).[1] Schmitz remains incarcerated.

---

[1]     Rule 7.1(b) of the Local Rules of the United States District Court for the Southern District of Alabama limits briefs filed in support of motions to thirty pages.

## II.    FACTS[2]

Trial testimony began with the victim identified in the indictment as "A", a 15-year-old young man who was in the ninth grade at the time of trial. Tr.[3] at 27. A described himself as an honor roll student who used to play football. *Id.* at 28. He lived in Jackson, Alabama, with his mother and half-brother, and his grandmother lived close by. November 4, 2008. *Id.* A's father died in 1996. *Id.* at 29.

A began his eighth grade year in the fall of 2006, and the defendant, Charlene Schmitz, was his reading teacher. *Id.* at 29-30. A did well in her class; he never had any problems. Later that school year, on Valentine's Day 2007, A started dating Schmitz's 13-year-old daughter, Tanya Smith. *Id.* at 30. Typically, they would "hang out" at Schmitz's house, or talk on the cell phone. *Id.* A had a "go phone," for which his mother bought a prepaid number of minutes each month. *Id.* at 31. A also chatted with Tanya on the internet, using the ID Nickleback92. *Id.* On one occasion, A's mother invited Tanya to join them for dinner, but A actually spent "a lot" of time with Tanya at Schmitz's house. *Id.*

A recalled that he went to baseball games with Tanya and her brother Jared, that they went to the movies, and they sometimes went swimming together. Schmitz and her husband Mike lived with Tanya and Jared in a house about 25 to 30 miles from A's home.[4] Because of

---

[2]    Given the voluminous nature of Schmitz's claims, and because they assume familiarity with many of the background facts and the trial court proceedings, the following statement of facts is provided for the Court's convenience.

[3]    For ease of reference, the transcript is referred to as "Tr." throughout this response. The transcript is available, however, on the electronic docket as Docs. 103 and 104.

[4]    At the time relevant to the indictment, A lived in Calvert Alabama, and Schmitz lived in Leroy, Alabama.

the distance, A began regularly spending the night at Schmitz's house. *Id.* at 32.  A also began spending time alone with Schmitz, talking by the pool or riding together in the car. *Id.* at 32-33.

On one occasion, Schmitz drove 25 to 30 miles to A's house to pick him up so that he could spend the night and attend a game with Jared. *Id.* at 32.  They were alone in the car together.  A recalled:

> We were talking while we were going to her house and she started talking about cheating and how she didn't like it.[5]  At that point I was thinking, okay, this is kind of weird.  And she said she needed to go to Jackson to get something to drink and cigarettes.  So we went to Jackson and she got the drink and cigarettes and I got something to drink.  And on our way back to her house we were on top of the Jackson bridge.  And she asked me if she asked to do something would I do it.  I said yeah.  And she asked if she could have a kiss.  I said yeah.
>
> Q.     And did you all kiss?
>
> A.     Yes, ma'am.

*Id.* at 34.

After that, A and Schmitz began to communicate regularly on the internet using Yahoo! chats. *Id.* at 34.  Schmitz used the ID "Charlene_schmitz2007. *Id.* at 35.  In addition, Schmitz told A that she wanted to buy him an iPod or a cell phone for graduating the eighth grade and entering high school. *Id.*  A already had an iPod, so Schmitz bought him a "Razr" cell phone.  A was careful.  When he was at home, he used the phone to send text messages to Schmitz; away from home, he used the phone to call Schmitz. *Id.*  When he called or sent messages to Schmitz's number it was to speak to Schmitz, not her daughter Tanya. *Id.* at 36.

---

[5]     The reference was to adultery.

Sometimes A made arrangements through text messages to talk with Schmitz on the phone. When they communicated through text messages, it was clear to A through the context of the conversations that he was chatting with Charlene Schmitz, not her daughter Tanya. *Id.* at 37-38. Sometimes he had doubts, but A believed that it was Schmitz who would refer to songs they had listened to earlier on the phone, and that it was Schmitz who commented that she needed to quit smoking and lose weight. *Id.* at 38-39.

A and Schmitz both used abbreviations in their chats, including ILY, "I love you"; IMY, "I miss you"; and INY, "I need you." *Id.* at 39. They exchanged the same sentiments when they spoke on the phone and when they were alone together. *Id.* at 39-40. A recalled that on June 22, 2007, his mother drove him to the Child Advocacy Center to give a statement (although she did not explain the actual reason for the trip). *Id.* at 40. As they drove to the Center, A was texting Schmitz so that he could spend the night at her house that night. *Id.*

On cross-examination, A noted that, during the time he was spending the night in the Schmitz home, Schmitz was not sharing a bedroom with her husband Mike. *Id.* at 53. He confirmed that Schmitz gave his mother a check for the Razr cell phone as a graduation present. *Id.* at 54. On re-direct, A affirmed that in his statement at the Child Advocacy Center, he said that he loved Schmitz and wanted to choose whom he wished to be with. *Id.* at 57. A and Schmitz had talked about having a future together: "[S]he was going to go to college with me and help me in college. We would be together after all of this." *Id.* at 58. A did not want Schmitz to get into trouble. *Id.*

Donna Marks is A's mother. Ms. Marks described her son A as a "good kid," who was "just a joy" to his mother. *Id.* at 59. When A entered the eighth grade, Schmitz was his reading

teacher.  *Id.*  Ms. Marks did not know Schmitz before she was A's teacher.  *Id.*  Ms. Marks recalled that A started spending time with Schmitz's daughter Tanya around Valentine's Day 2007.  *Id.* at 59-60.

Ms. Marks first allowed A to spend the night at the Schmitz house so that he could attend a baseball tournament in Leroy (some 25 miles from A's home) where games were scheduled to be played over a two-day period.  *Id.* at 60.  A then began staying at the Schmitz home more frequently because he would do things and stay out late with Tanya or her brother Jared.  *Id.*

Ms. Marks purchased a "go phone" for A at the beginning of his eighth grade year so that he could reach her after athletic practices.  *Id.* at 61.  Ms. Marks purchased a set amount of minutes each month for A's use.  *Id.*  Although the minutes were initially adequate for A's usage, they began to run out by mid-month near the end of the school year.  *Id.*  A explained that he was using the minutes up on text messages.  *Id.*  Schmitz then offered to purchase a Razr cell phone as a graduation present for A.  *Id.* at 62.  Ms. Marks was spending more on the "go phone" at this point than she would on a regular cell phone plan, so she agreed.  *Id.*  Ms. Marks ordered the Razr, and Schmitz wrote her a check for $125.  *Id.* at 62-63.  Ms. Marks initially protested that $125 was too much, but Schmitz told her "not to worry about it."  *Id.*  A thanked Schmitz for the gift.  *Id.*

Ms. Marks held the check, intending to deposit it when the first month's phone bill came in.  *Id.* at 63-64.  However, she ended up turning the check over to law enforcement after the relationship between A and Schmitz was revealed.  *Id.* at 64.  The check was admitted into evidence.  *Id.*

On June 21, 2007, Ms. Marks and her younger son arrived at Schmitz's house to pick up A. *Id.* Schmitz came out to the car and told Ms. Marks that Schmitz's husband would be working until midnight and that Schmitz's children wanted to go to a movie. *Id.* at 65. She asked if A could go with them. *Id.* Ms. Marks responded that A had some work do to at home, including cleaning his room and cutting the grass, but that he could go if he finished those tasks. *Id.*

Ms. Marks then left and was at a gas station when A received a text message from Schmitz. *Id.* at 66. The text message said that Tanya and Jared had changed their minds and wanted to go bowling instead. A showed the message from Schmitz to his mother, asking if the change in plans was alright. *Id.* Ms. Marks read the message and noticed that it ended with "ILY!" *Id.* at 67. Ms. Marks knew that this meant "I love you!" *Id.* She recalled:

> My first reaction was a double take, because once he realized what was on the phone he jerked it back very quickly. And I jerked it back from him to make sure that I had understood that I had saw what I had saw. And at that point I did not do anything. I paid for my gas. I got in the car and whenever I got in the car my reaction was why in the hell is Charlene Schmitz telling you she loves you?

*Id.*

After hearing his answer, Ms. Marks went home and discussed the text message with her mother, Gladys Goodman. *Id.* at 67-68. Ms. Marks and her mother logged went to the computer, logged onto A's Yahoo! account, and read his saved chats. *Id.* Ms. Marks was in shock at the messages but did not discuss them with A. *Id.* The next day, Ms. Marks consulted her doctor and the took A to the Child Advocacy Center. Following advice, Ms. Marks did not tell A the true purpose of their visit to the Center. *Id.* at 69. As they drove, A was sending text messages. *Id.*

On cross-examination, Ms. Marks noted that she had sought advice from an attorney on what could be done to keep Schmitz away from her son. *Id.* at 73-74. As she explained on re-direct, once he entered the ninth grade, Ms. Marks noticed that Schmitz was parking on the Leroy High School campus close to where A would emerge at the end of the school day. *Id.* at 77-78. Even after a parking procedure was implemented by the school principal in response to Ms. Marks' concerns, Schmitz continued to park where A would come out of his seventh period class. *Id.* Ms. Marks then discussed her concerns with the district attorney. *Id.* at 78. Finding that he was not helpful, Ms. Marks then consulted an attorney. *Id.* at 79. Ms. Marks said her son was in love with Schmitz, and she feared that Schmitz would run away with him. *Id.* Ms. Marks had no knowledge of whether Schmitz was still trying to communicate with A until Schmitz was re-arrested in November 2007. *Id.* at 79.

Joe Thomson, the Chief Assistant District Attorney for Alabama's First Judicial Circuit, testified for the United States. Mr. Thomson was at the Child Advocacy Center in Grove Hill on June 22, 2007 when A gave a statement. *Id.* at 82. Mr. Thomson witnessed a portion of A's statement. Mr. Thomson left the interview after being notified that A's cell phone was receiving a text message. *Id.* at 82-83. The message in question was from Schmitz, and it said, "call when you can." *Id.* at 84. Mr. Thomson also recognized a sent message from A saying, "I may not go in with them." *Id.*

Several law enforcement witnesses testified regarding two computers and Schmitz's cell phone seized by search warrant on June 22, 2007. The phones were secured in evidence along with A's computer and cellphone and all were turned over for forensic examination to United States Secret Service Agent Kevin Levy and the United States's forensic expert, Konstantinos

"Gus" Dimitrelos.[6]

Business records from Yahoo! in Sunnyvale, California, concerning the chat accounts were introduced into evidence by stipulation. *Id.* at 102-03.

Mr. Dimitrelos, a former Secret Service Agent, was accepted by the Court as an expert in computer and cellular forensic examinations with no objection from Schmitz. *Id.* at 106-13. Sparing this Court a lengthy explanation of the technical protocols, *id.* at 113-21, Mr. Dimitrelos retrieved the names and phone numbers stored in both A's and Schmitz's cell phones. *Id.* at 121. He was also able to retrieve sent and received text messages, photographs, and technical data such as IMSI and IMEI numbers. *Id.* at 122.

Based on his forensic examination of A's phone, Mr. Dimitrelos noted that Schmitz's phone number, identified as "Charlene," was listed in the index of received calls on A's cell phone. *Id.* 123. A's phone also had three stored text messages from June 22, 2007, all coming

---

[6]     Officer Donnie Sullivan of the McIntosh, Alabama, Police Department, testified about his participation in a search warrant at Schmitz's residence. *Id.* at 85. Officer Sullivan seized a Dell 1501 laptop from Schmitz's daughter's bedroom, and it was placed in an evidence locker. *Id.* at 86. A desktop computer was also seized during the search. *Id.* at 88. According to Sullivan, A's computer and cell phone were also seized with the consent of A's mother and secured in evidence. *Id.* at 91, 92.

Deputy Luke Singleton of the Chatom Police Department testified briefly that he seized the Dell desktop from a spare bedroom in Schmitz's house. *Id.* at 93-94.

Officer Aaron B. Carpenter of the Washington County Sheriff's office testified that Schmitz arrived during the execution of the search warrant at her residence on June 22, 2007. *Id.* at 96. Deputy Carpenter seized her cell phone. *Id.*

Chief Deputy Terry Beasley, also of the Washington County Sheriff's office, identified the receipt by which he turned over the computers and cell phones in the investigation to United States Secret Service Agent Kevin Levy and the United States' forensic expert, Gus Dimitrelos. *Id.* at 98-99.

from "Charlene," as well as four sent messages to "Charlene". *Id.*[7] Mr. Dimitrelos also

identified a similar report for Schmitz's cell phone. Both cell phone reports were admitted into

evidence. *Id.* at 127.

Mr. Dimitrelos also recovered Yahoo! Instant Messenger chat logs between

charlene_schmitz2007 and Nickleback92 from the victim's computer, evidence item 003. *Id.* at

127-133. The chat logs were admitted into evidence as Government Exhibit 3.

Several of the chats were read to the jury, with Mr. Dimitrelos reading the part of

charlene_schmitz2007 and the AUSA reading the part of A. Tr. at 136. In the first chat,

beginning at 12:41 a.m. on the morning of Saturday June 2, 2007, Schmitz told A that she was

panicking and asked A how to delete her chat logs. *Id.* at 136-38. Schmitz also worried that her

daughter could access the chat logs on the computer. *Id.*

In a chat on the afternoon of June 3, 2007, Schmitz told A that she had to go because her

husband wanted something to eat. She signed off, "love u bye bye," and A responded "kk,[8]

love u 2 bye." *Id.* at 139, Gov. Ex. 3, Sunday June 9, 2007, at 16:00:03. Again on the afternoon

of June 3, A told Schmitz that he needed and missed her, and he asked if she would come get

him. *Id.* at 141. Schmitz told A, "I wish you were old enough that I would not get into trouble. I

would not let any of the rest stop me. I miss you too." *Id.* and Gov. Ex. 3, Sunday June 3, 2007,

at 16:09:51.

A graphically sexual chat around 1:00 a.m. on the morning of June 9, 2007, included the

following:

---

[7]     The messages to "Charlene" included "Almost 2 grove hill" – where the Child
Advocacy Center was located – and "[O]K, I may not go in wit them [*sic*]."

[8]     K is chat lingo for "OK."

| | |
|---|---|
| Schmitz: | I love u more than life itself |
| Schmitz: | u r everything 2 me |
| A: | I love u 2 baby u mean so much to me . . . . i need to even go on lord knows wut i would be like without u . . . i need u more than anything |
| Schmitz: | well u have me now and forever |
| A: | same here |
| A: | i love u till the day i die and then more |
| Schmitz: | ditto |

* * * * *

| | |
|---|---|
| A: | wut r u thinking bout now |
| Schmitz: | ur nipple |
| A: | ooooooooooo |
| A: | anything else |
| Schmitz: | ur ear |
| A: | ooooooo messin wit me . . . . i like it |
| Schmitz: | touchin ur scruffy face |
| Schmitz: | and kissing my spot |

| | |
|---|---|
| A: | ooooooooooooooooooooooooooo |
| Schmitz: | yea |
| A: | being a bad girl [ain't] u |
| A: | u know what bad girls get |
| Schmitz: | ??? |
| Schmitz: | laid? |
| A: | yea that |
| A: | whoopins |
| Schmitz: | oooooooooooooooooooooooooooooooooooo |
| A: | :-> |
| A: | i am thinkin a sinful thought now |
| Schmitz: | god he got up again |
| A: | damn |
| Schmitz: | what was the sinful thought? |
| A: | wut i did wit my tong and yur place |
| Schmitz: | well im not sure i would say sinful |
| A: | well i could make it |
| Schmitz: | uve got ur s's messed up |
| Schmitz: | i would say satisfying |
| A: | oooooooooooooooo |
| A: | i can do that 2 |
| Schmitz: | yea |
| A: | yea |

| | |
|---|---|
| A: | any time u want |
| Schmitz:: | oooooooooooooooooooooooo |
| A: | yup |
| Schmitz: | not such a finicky eater anymore? |
| A: | nope |
| Schmitz: | that was bad! |
| A: | i tought it was hot |
| Schmitz: | yeahhh |
| Schmitz: | I love you |
| A | i love u 2 baby |

* * * * *

| | |
|---|---|
| Schmitz: | i need time with u is what i need |
| A: | well u can get that time when i see u next time |
| A: | along with anything else |
| Schmitz: | gosh |
| Schmitz: | i like that |
| A: | wut? |
| A: | i bet u do |
| Schmitz: | i miss u |
| A: | i miss u 2 |
| Schmitz: | yea |
| Schmitz: | i am going to go |
| Schmitz: | i will dream of u |
| A: | ok bye i love u and i will talk to u tom[o]rrow . . . . maybe they won't be sinful |
| Schmitz: | they probably will |
| A: | o well |
| Schmitz: | yea o well |

* * * * *

| | |
|---|---|
| Schmitz: | i love u babe lots and lots |
| Schmitz: | will ttul [talk to you later] |
| A: | i love u 2 sweetheart night |
| Schmitz: | goodnight i love u |
| Schmitz: | bye bye |
| A: | bye |

*Id.* at 144-48, and Gov. Ex. 3, Saturday June 9, 2007, beginning at 01:22:42 and ending 01:45:05.

The jury also heard a similar exchange from a June 12, 2007, chat that occurred shortly

after 11:00 p.m.:

| | |
|---|---|
| A: | wish we had the whole rest of the year and then sum |
| Schmitz: | yea |
| A: | playing wit my nip[p]le hair . . . . . and it is makein me think of you |
| Schmitz: | oooooooooooooooooooooooooooooooooo |
| A: | and i kno wut yur thinking r about to say |
| Schmitz: | ??????? |
| A: | yur messin wit me |
| Schmitz: | arent u? |
| A: | yea a lil bit |
| Schmitz: | i do miss u |
| A: | i miss u 2 i haven't smiled since we got home |
| Schmitz: | i just like lookin at u. . . . . |
| A: | same her . . . . i like holding yur hand |
| Schmitz: | but i want u 2 smile cuz i love ur smile |
| A: | i kno |
| Schmitz: | i like seeing ur smile |
| A: | :D |
| Schmitz: | u looked good 2nite |
| A: | i love looking into yur eyes |
| A: | thank u |
| A: | u 2 |

* * * * *

| | |
|---|---|
| A: | while i was washin my hair i got water in my ear and i put my finger in there to try and help get it out and i was like this remindes me of sumthing |
| Schmitz: | mmmmmmmm |
| A: | yea thats wut i was thinkin[g] |

Tr. at 149-50, Gov. Ex. 3, beginning June 12, 2007 at 23:09:25 and ending 23:15:53.

In a June 12, 2007 chat around 11:30 p.m., Schmitz thanked A for deleting some text messages, and then A told Schmitz, "for some strange reason it feels like your body is up against mine right now," and "a while ago I felt like I was kissing you. . . . it was good I wish it would've been the real thing though." *Id.* at 150-52, Exhibit 3, June 12, 2007 beginning at 23:28:53. Schmitz then asked A to sign off the chat and call her on the phone. *Id.*[9]

---

[9] It was very common for Schmitz and A to end their chats by making arrangements to speak on the phone. *See* Gov. Ex. 3, *passim.*

In a June 15, 2007, chat just after 11:00 p.m., Schmitz carefully warned A not to talk because Schmitz's daughter – A's supposed girlfriend – was in the room. *Id.* at 153.[10] Mr. Dimitrelos's direct examination ended with the reading of one more chat transcript on June 3, 2007, in which Schmitz silenced A because her husband had woken from his sleep to take a pain pill. *Id.* at 154. Schmitz described her husband as a "whussie." *Id.* Gov. Ex. 3, June 3, 2007 at 21:19:38.

A clinical psychologist, Dr. Catalina Arata, also testified for the United States; she was qualified as an expert in child sexual abuse without a defense objection. Tr. at 180-84. Dr. Arata described "grooming" – in the context of child sexual abuse, "the process by which an adult establishes a relationship with the child" – to the jury. *Id.* at 185. As she explained:

> Typically the way it will work is a child – an adult will target a particular child or identify a particular child. It may be a family member's friend. It may be someone they know. It could be a coach and a child. But basically you have an adult that establishes a special relationship with a child. . . At first it may look like a great adult friendship that – isn't it great that this adult is taking an interest in this child? Often an adult might choose children who have some vulnerability[11] that as a child that has family problems or peer problems or even

---

[10]     This was a routine occurrence. Schmitz and A had worked out a code where he would stop chatting if Schmitz typed a series of j's. "Anytime I type a bunch of jjjj it means someone is close and don't say anything." Tr. at 153, citing chat log, Gov. Ex. 3, on June 3, 2007 at 21:16:15. Similarly, it was not uncommon for A to abruptly change the subject during chats with Schmitz if one of his family members entered the room. *See, e.g.,* Gov. Ex. 3, June 3, 2007 at 16:24:31 ("Can we change the subject sumbody is behind me").

A and Schmitz took other steps to conceal their relationship. In a June 6, 2007, chat, A asked Schmitz what she did with his boxer shorts after he left them at her house. She responded that she had hidden them under the sink with the bathing suits, where her daughter had found them. A responded, "O shit," but Schmitz reassured him that her daughter merely thought he had left them at Schmitz's house. Gov. Ex. 3, June 6, 2007 beginning at 22:28:12.

[11]     A's father died in 1996 when he was only four years old. A told Schmitz in their chats that he only had two wishes: "to see my dad again . . . the other is [you]." Gov. Ex. 3, June 3, 2007 at 23:34:29. Schmitz responded, "well u already have one and u will have the other one

just a child that is left unsupervised a lot.

       The process that is described in the literature as well as by offenders who have been caught will be that you do things like talk to the child a lot, give them special attention. The adult may become very supportive. This is the only person that seems to understand this child. They may take the child's side.[12] Oh, I can't believe that happened to you. Showing the child a lot of attention.

       Over time the boundaries become blurred. So it is more like a peer relationship. The child – the adult might relate to the child like a peer. Begin to disclose their own problems, talking about their own issues.[13] Again, cultivating the feeling of the child that they are special, here this adult is treating me like an adult now, telling me things and confiding in me. Aren't I special that this adult wants to take an interest in me. . . .

       Now the idea behind the grooming is it sets a stage where physical force is not needed for an adult to engage in sexual behavior with a child because they have established this special relationship where the child is going to do what the adult wants. . . . the words coerced even doesn't apply here for the adult to get the child to go along with things.

       The adult might even set it up so it doesn't even seem like they are setting up – the child is choosing the behavior. These are things we are going to do because we are special. And this also sort of sets it up for a child to perhaps not feel like – to feel like it's their own responsibility. I choose to do this. I wasn't made to do this. I choose to do this because I love this person and we have a special relationship.

*Id.* at 186-88.

       Dr. Arata noted that gift giving was a common part of the grooming process. *Id.* at 188.

She also agreed that, a child who has lost a parent might be more vulnerable to grooming, and

that an authority figure who singles out a child with grooming behavior might make the victim

_____

day." *Id.* at 23:35:01.

     [12]    When A's mother became angry and threw a toy at him, Schmitz responded in precisely this fashion, as documented in the chat logs. Gov. Ex. 3, June 3, 2007, beginning at 21:51:44.

     [13]    This was certainly true in Schmitz's contemptuous references to her husband in chats with A.

feel even more special.  *Id.*

A's grandmother, Gladys Goodman, testified briefly.  Ms. Goodman recalled that on June 21, 2007, she was having supper with her daughter Donna Marks, who is A's mother, when Ms. Marks left to go to her trailer, which was next door.  *Id.* at 195.  When Ms. Marks did not return, Ms. Goodman went to look for her in her trailer.  She found her daughter Ms. Marks inside, hysterical and crying over chats she had printed out from the computer.  *Id.* at 196.  Ms. Goodman reviewed the chats and "almost had a heart attack. . . . I just – I was so broken hearted at what I was reading in the chats."  *Id.*

The United States rested at the conclusion of Ms. Goodman's testimony.  *Id.* at 197. Schmitz's motion for judgment of acquittal was denied; this Court found sufficient facts to submit the charges to the jury.  *Id.* at 201.

In her defense, Schmitz first called Michael Black, a computer expert, who testified that Schmitz's daughter could access Schmitz's Yahoo! instant messenger account on her laptop if she knew Schmitz's password.  *Id.* at 224.  Mr. Black found no evidence of any attempt to remove data from the daughter's laptop computer.  *Id.* at 227.  Mr. Black could not say who used Schmitz's Yahoo! account to chat with A.  *Id.* at 231.

Michael Schmitz also testified on his wife's behalf.  Tr. at 268.  Contrary to A's testimony, Mr. Schmitz denied that he and the defendant were sleeping in separate bedrooms in June 2007.  *Id.* at 269.  Mr. Schmitz testified that on June 9, 2007, he and Schmitz were working on his sister-in-law's trailer in the later afternoon, and that their daughter was not with them.[14]

---

[14]     The 61-page chat log admitted into evidence as Government Exhibit 3 included a one-page chat between Schmitz and A that took place at 4:00 p.m. on Saturday June 9.  Gov. Ex. 3, page 41.

*Id.* at 271-72. Mr. Schmitz confirmed that he was intimate with his wife in June 2007. *Id.*

On cross-examination, Mr. Schmitz maintained that his wife never left the bedroom at night without his knowledge, because he was a light sleeper. *Id.* at 272-73. When shown specific portions of the chat transcripts, Mr. Schmitz confirmed that he had a urostomy, but he said he had never taken pain pills. *Id.* at 274-76.

Schmitz's 13-year old son took the stand and testified that he accompanied his mother and A when they drove to the store for Schmitz to get cigarettes. *Id.* at 280.[15]

Schmitz's 14-year-old daughter, who had been A's girlfriend, testified that she became jealous of A, her boyfriend, after he enjoyed riding with another girl on a roller coaster. *Id.* at 288. And so, she began to chat with A using Schmitz's Yahoo! IM account "to see why he did – why he was acting like he was." *Id.* at 289. Schmitz's daughter maintained that she had authored every one of the chats with A. *Id.* at 291. When the daughter supposedly made arrangements for A to call Schmitz's cell phone, the daughter testified that Schmitz never answered A's calls because she always turned her phone off at night.[16] *Id.* at 299.

Schmitz's daughter was unable to explain the context and meaning of the chats. *Id.* at 300-09. When the chats became sexual in nature, Schmitz's daughter saw no reason to tell her father about it. *Id.* at 305-06. When asked why she did not report herself as author of the chats

---

Schmitz's ex-husband, Paul Richardson, testified that he, too, was present for the work on Schmitz's sister's home on June 9, 2007. Tr. at 281-83.

[15] *But see* A's testimony concerning the first occasion on which he and Schmitz kissed, Tr. at 34.

[16] The chat logs show that Schmitz asked A to call her at other times of the day than late at night. *See, e.g.,* Gov. Ex. 3, June 9, 2007 at 13:43:16 and 16:08 22; *id.* June 16, 2007, at 13:07:27.

to the police after her mother was arrested, the daughter responded that no one ever asked her if she wrote the chats.  *Id.* at 311.

When the chat spoke of A "kissing my spot," the daughter explained that this meant forehead, because this is often where Schmitz would kiss people when in public.  *Id.*  When asked about A's chat comment on sinful thoughts and "what I did with my tongue in your place," Schmitz's daughter responded that this was surely a typographical error, and A was actually talking about a "plate".  *Id.* at 312.  Schmitz's daughter offered a literal explanation of the question posed to A, "not such a finicky eater anymore?"  She said that A was "a picky eater." *Id.* at 313.

Schmitz testified in her own defense.  *Id.* at 315.  She began by confirming that she was born on August 21, 1952 and lived in Leroy, Alabama with her husband Mike and two children. *Id.* at 315-16.  Echoing portions of her husband's testimony, Schmitz stated that she was working at her sister's trailer on the afternoon of June 9, 2007.  *Id.* at 317.  She confirmed that her husband had suffered from bladder cancer, that he used a catheter bag beginning in May 2007, and that his bladder was subsequently removed.  *Id.* at 318.  Schmitz described her marriage as "wonderful," and testified that she had been intimate with her husband during the period described in the indictment.  *Id.*  Schmitz flatly denied being the author of any of the Yahoo! instant messages with A.  *Id.* at 319.

On cross-examination, Schmitz denied using her daughter's computer other than for the first few days after they purchased it.  *Id.* at 320.  Schmitz preferred to use the desktop computer in their home.  Schmitz said she never knew her daughter was supposedly chatting with A in the early morning hours.  *Id.* at 322-23.

Schmitz did not alter her recollection of the June 9, 2007, work at her sister's residence, even when shown the June 9, transcript in which charlene_schmitz2007 wrote, "just came back from up the road." *Id.* at 324.

Schmitz could not explain why her daughter had not informed the police that she, rather than her mother, had authored the chats with A, even though this information would have exonerated Schmitz. *Id.* at 326-27. Neither could Schmitz explain why her daughter would have adopted such a sexual tone or professed love for A if the chats were supposed to be from Schmitz. *Id.* at 328-29.

Schmitz had no explanation for why her daughter, the supposed author of the chats with A, would write to him, "I wish you were old enough that I would not get into trouble. I would not let any of the rest stop me." *Id.* at 332-33. Schmitz acknowledged that a June 3, 2007, chat concerning her husband's physical condition, including the term "whussie" showed a lack of empathy. *Id.* at 335.

Schmitz confirmed that she had given A $30 in spending money for a trip to Disney World, and a $125 check to A's mother for the Razr cell phone. *Id.* at 337-38. Schmitz twice took A and her daughter to visit A's father's grave. *Id.* at 338-39. Schmitz saw no reason to inform A's mother of these trips. *Id.* at 339. Schmitz picked A up from his weight training sessions, and she sometimes took him to get something to eat. *Id.* at 339-40. Schmitz recalled that A sometimes confided to her, but she couldn't recall confiding in him. *Id.* at 340. She could not explain what was meant by the "finicky eater" comment after A spoke of "what I did with my tongue in your place." *Id.* at 342.

The defense rested after the conclusion of Schmitz's testimony. Defense counsel and the AUSA then discussed jury instructions with this Court, and the Court granted every change to the instructions that the defense suggested. *See id.* at 348-52. After closing arguments, the jury found Schmitz guilty of both counts. *Id.* at 403.

## III.   DIRECT APPEAL

Schmitz immediately filed a notice of appeal. The only argument raised on appeal, however, was that the evidence at trial was insufficient for conviction. *See United States v. Schmitz*, 322 F. App'x 765, 766 (11th Cir.), *reh'g denied*, 347 F. App'x 557 (11th Cir. 2009). In a *per curiam* opinion, the Eleventh Circuit briskly dismissed this argument, noting that:

> As in *Goetzke*, the record here shows that the evidence was sufficient to support Schmitz's convictions. Her disbelieved testimony, along with the facts that she offered to buy the minor a cell phone and sent him messages expressing her love and desire to pursue a sexual relationship with the minor, established that she had the specific intent to persuade, induce, or entice him to engage in prohibited sexual activity. *See Goetzke*, 494 F.3d at 1235; *Brown*, 53 F.3d at 314-15. Additionally, the messages Schmitz sent the minor, combined with the fact that she drove 25 to 30 miles to pick him up in order to initiate a physical relationship, constituted a substantial step towards persuading, inducing, or enticing the minor to engage in prohibited sexual activity. *Murrell*, 368 F.3d at 1288; *Goetzke*, 494 F.3d at 1235-37. Accordingly, we affirm.

*Id.* at 768.[17]

---

[17]    The full citation for the three cases cited in the quotation are *United States v. Goetzke*, 494 F.3d 1231 (9th Cir. 2007), *United States v. Brown*, 53 F.3d 312 (11th Cir. 1995), and *United States v. Murrell*, 368 F.3d 1283 (11th Cir. 2004).

## IV. DISCUSSION

### A. Claims I and III

Schmitz lumps numerous sub-claims under the title of each of her three claims, but her only arguments that warrant substantial analysis are the sub-claims that fall under issue two, wherein she alleges ineffective assistance of trial and appellate counsel. All of the sub-claims, whether categorized under issue one, two, or three, are confusing, as well as conclusory. In fact, they truly exhibit a firework finale-type strategy, dazzling the reader with numerous cross-referencing claims, as if the very number of claims will vindicate Schmitz. She will not prevail.

All of the sub-claims that Schmitz raises under issue one, *see* Doc. 136, are procedurally defaulted. *See Black v. United States*, 373 F.3d 1140, 1142 & n.2 (11th Cir.), *cert. denied*, 543 U.S. 1080 (2005) (challenges to convictions or sentences not made on direct appeal are procedurally barred). The only way to overcome the default is if a petitioner demonstrates – for nonconstitutional claims – that "the alleged error constitutes a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Burke*, 152 F.3d 1329, 1331 (11th Cir.), *cert. denied*, 526 U.S. 1145 (1999). Or – in the case of constitutional claims – the petitioner must "show cause excusing his failure to raise the issues previously and actual prejudice resulting from the errors." *Cross v. United States*, 893 F.2d 1287, 1289 (11th Cir.), *cert. denied*, 498 U.S. 849 (1990). Schmitz has not met her burden. In fact, she fails to specifically allege cause and prejudice on these sub-claims, and thus the issue one sub-claims are

due to be summarily denied.[18]

Likewise, the sub-claims raised under issue three are due to be denied as patently frivolous. All claims of error she raises therein argue that the Eleventh Circuit erred by ruling against her on direct appeal. Of course, Schmitz misunderstands the relationship between federal district courts and circuit courts, as well as direct appeals and habeas petitions. Habeas relief is an extraordinary remedy which "may not do service for a [] [direct] appeal." *United States v. Frady*, 456 U.S. 162, 165 (1982). And even if it could supplement a direct appeal, it cannot serve to allow a district court to overrule a circuit court. This claim is utter nonsense and is also due to be summarily denied.

## B. Claim II – Ineffective Assistance of Counsel

Though Schmitz's first and third claims are easily disposed of, the second claim wherein she re-styles many of her arguments as the result of ineffective assistance of counsel requires more analysis.

### 1. The *Strickland* Standard

To establish a claim for relief based upon ineffective assistance of counsel, a defendant must meet the following two-pronged test: (1) she must show that his counsel's representation was deficient; and (2) she must show that the deficient representation resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Judicial scrutiny of counsel's performance is highly deferential, and courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 688. "The presumption of

_____

[18] Schmitz nevertheless re-raises virtually all of these sub-claims under the guise of ineffective assistance of counsel in her second claim.

reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel." *Callahan v. Campbell*, 427 F.3d 897, 933 (11th Cir.), *cert. denied sub nom.*, 549 U.S. 952 (2006). And in addressing the second prong, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different; in other words, confidence in the outcome of the proceeding must be undermined. *Strickland*, 466 U.S. at 694. "[P]etitioners must affirmatively prove prejudice because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. [T]hat the errors had some conceivable effect on the outcome of the proceeding' is insufficient to show prejudice." *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (alteration in original) (quoting *Strickland*, 466 U.S. at 693).

But a court need not address both components of the inquiry if the defendant fails to make a sufficient showing on one component. *Id.* at 697. For instance, if there is an insufficient showing of prejudice, the court need not address the adequacy of counsel's performance. *Id.* Given this stringent burden, "the cases in which habeas petitioners can properly prevail . . . are few and far between." *Waters v. Thomas*, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc).

        2.      The Superseding Indictment (*See* Doc. 139-1, Claims U, DD, EE, LL, & MM)

Schmitz first claims that her counsel was deficient in failing to challenge the sufficiency of the superseding indictment prior to trial. Specifically, she claims that her counsel should have (1) moved for a bill of particulars, (2) moved to strike surplusage from the indictment, (3) moved to dismiss the superseding indictment, and (4) appealed the conviction based on the defective indictment. *See* Doc. 139-1 at 4-13, 29-35, 58-67. All of these claims are meritless.

Title 18, United States Code, section 2422(b) provides that:

Whoever, using the mail or any facility or means of interstate or foreign commerce, . . . knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

The superseding indictment tracked the language of the statute:

<u>COUNT ONE</u>

Between August 30, 2006 through August 30, 2007, in the Southern District of Alabama, Southern Division, and elsewhere, the defendant,

CHARLENE SCHMITZ,

used a facility of interstate commerce, to-wit: a computer connected to the internet, to knowingly attempt to persuade, induce, entice and coerce an individual who has not attained the age of eighteen years, to-wit: "A", to engage in or attempt to engage in sexual activity for which any person can be charged with a criminal offense.

In violation of Title 18, United States Code, Section 2422(b).

<u>COUNT TWO</u>

Between August 30, 2006 through August 30, 2007, in the Southern District of Alabama, Southern Division, and elsewhere, the defendant,

CHARLENE SCHMITZ,

used a facility of interstate commerce, to-wit: cellular phone service, to knowingly attempt to persuade, induce, entice and coerce an individual who has not attained the age of eighteen years, to-wit: "A", to engage in or attempt to engage in sexual activity for which any person can be charged with a criminal offense.

In violation of Title 18, United States Code, Section 2422(b).

Doc. 44.  The superseding indictment noted that Schmitz was also known as

"charlene_schmitz2007@yahoo.com." *Id.*

Schmitz now alleges that this indictment was defective, essentially because it did not reference the underlying Alabama statute. She thus argues that her counsel's failure to either move to dismiss the indictment for lack of specificity or move for a bill of particulars rendered his performance constitutionally ineffective. This claim has no legal leg to stand on. For one thing, counsel cannot be held ineffective for failing to advance a novel legal theory that has no firm support in case law. *See Echols v. Thomas*, 33 F.3d 1277, 1278 (11th Cir. 1994) (counsel "not ineffective for failing to recognize or assert [a] novel claim").

An indictment must "be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). As to the specificity of an indictment, the Supreme Court has stated that:

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.

*United States v. Jones*, No. 1:05-CR-617, 2007 WL 2071267, at *8 (N.D. Ga. July 19, 2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). And for those that track the language of a statute, the Supreme Court has set the following parameters:

> It is generally sufficient that an indictment set forth the offense in the words of the statute itself as long as "those words of themselves fully, directly, and expressly without any uncertainty or ambiguity set forth all the elements necessary to constitute the offence intended to be punished." [*United States v. Carll*, 105 U.S. 611, 612 (1881).] "Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description with which he charged." [*United States v. Hess*, 124 U.S. 483, 487 (1888)].

*Jones*, at *9 (quoting *Hamling*, 418 U.S. at 117-18). An indictment need only "be sufficiently

specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecution for the same offense. An indictment satisfies these requirements as long as the language therein sets forth the essential elements of the crime." *Id.* at *11 (citing *United States v. Critzer*, 951 F.2d 306, 308 (11th Cir. 1992)) ("Constitutional requirements are fulfilled by an indictment that tracks the wording of the statute, as long as the language sets forth the essential elements of the crime.") (citation and internal quotes omitted); *United States v. Cole*, 755 F.2d 748, 759 (11th Cir. 1985)). "An indictment is not insufficient merely because some necessary allegation was stated with less specificity than might have been used." *Id.* (quoting *United States v. Sutherland*, 656 F.2d 1181, 1197 (5th Cir. Sept. 25, 1981)).[19]

At least one court in this circuit has already held that "[b]y tracking the language of 18 U.S.C. § 2422(b), [an indictment] state[s] the essential elements of the violations alleged under this statute." *United States v. Powell*, 1 F. Supp. 2d 1419, 1423 (N.D. Ala. 1998). That is precisely what the superseding indictment did in this case. Doc. 44. Further, as in *Powell*, the language not only tracks the statute, but additionally outlines the dates of the criminal activity, the means of interstate commerce used, and even the screen name Schmitz used to further the crime. *See id.*

Schmitz nevertheless asserts that her counsel was deficient for failing to recognize the key omission from the superseding indictment, the citation to an underlying Alabama statute. But she points to no controlling precedent that dictates any requirement for such a citation. In

_____

[19]        In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

*Powell*, for instance, no underlying state criminal offense was cited in the indictment, and that indictment was nonetheless upheld. *Id.* at 1420; *but see United States v. Lanzon*, No. 06-20783, 2008 WL 3271092 (S.D. Fla. Aug. 8, 2008) (granting motion to dismiss § 2422(b) indictment that failed to specify the underlying state offense, but also granting leave for the United States to file a superseding indictment and basing the decision in part on the fact that the United States would not be prejudiced).

Even if counsel should have objected to the superseding indictment, Schmitz cannot demonstrate prejudice, anyway. And this is fatal to her claim. If counsel had objected, "it is not at all clear how even a successful challenge would have ultimately benefitted" Schmitz. *United States v. Taylor*, 454 F.3d 1075, 1082 (10th Cir. 2006). The United States would have simply reindicted Schmitz with the underlying Alabama statute included. *See id.* Besides, even though her counsel did not object to the superseding indictment prior to trial, counsel did, nonetheless, object at the close of the United States's case-in-chief. *See* Tr. at 347. However, this objection was rejected by this Court. *Id.* In instructing the jury, this Court also was careful to instruct on the three Alabama statutes at issue: rape, sodomy, and sexual abuse. *See id.* at 394-95. Thus any omission in the indictment was cured by the jury instructions.

Neither is it clear how a bill of particulars would have been of assistance. "The purpose of such a bill is 'to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense.'" *United States v. Roberts*, 174 F. App'x 475, 477 (11th Cir. 2006) (unpublished) (quoting *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986)). "A bill of particulars is not required where the information sought

has already been provided by other sources, such as the indictment and discovery." *Id.* (citing

*United States v. Martell*, 906 F.2d 555, 558 (11th Cir. 1990)). Schmitz was *intimately* aware of

the basis of the charge against her. She had already been arrested and charged on violations of

state law prior to the prosecution by the United States. And as was repeatedly made clear, "the

defendant's crimes are contained within the communication" between Schmitz and the minor

victim. Doc. 51 at 2. "These communications are contained in computer chats and instant

messages primarily," and that evidence was disclosed by the United States.[20] *Id.* Schmitz's

assertions that she was not on notice of the charges thus ring hollow.

She additionally makes the claim that counsel was deficient for failing to move the court

to strike surplusage from the indictment. Doc. 139-1 at 8-9. She alleges that the portion of the

superseding indictment that states "to engage or attempt to engage in sexual activity" contains the

surplusage: "or attempt to engage." *Id.* at 8. She argues that this surplusage distracts the jury

from the true criminal *mens rea* at issue: the "persuasion and the attempt to persuade, not the

performance of the sexual acts themselves." *United States v. Murrell*, 368 F.3d 1283, 1287 (11th

Cir. 2004). This is patent nonsense. As the Supreme Court has previously observed, "a

defendant's right to be tried on the charges set forth in the indictment is not impaired where the

indictment alleges more acts than are necessary for conviction." *United States v. Tykarsky*, 446

F.3d 458, 474 (3d Cir. 2006) (citing *United States v. Miller*, 471 U.S. 130, 136 (1985)).

Additionally, the district court specifically instructed the jury on the intent required for

conviction, saying "it is not necessary for the Government to prove that the minor was actually

---

[20]        Moreover, Schmitz does not even allege that she was not provided with full
discovery.

persuaded or induced or enticed to engage in sexual activity; but it is necessary for the Government to prove that the Defendant intended to entice, induce or persuade a minor to engage in some form of unlawful sexual activity." *See* Tr. at 393. The jury was therefore fully apprised of the intent requirement for conviction. She has thus, again, failed to demonstrate prejudice.

Schmitz next asserts that the indictment was multiplicitous because the two counts charged in the indictment were "violations of the same statute within the same time period and the same minor . . . particularly in light of the fact prosecutors never alleged or presented any evidence of Schmitz initiating a cell phone call or text." Doc. 139-1 at 34. Thus, she argues that her counsel was ineffective in failing to move for dismissal. In fact, there was ample evidence of Schmitz communicating to the victim via cellular phone and text. *See*, *e.g.*, Tr. at 35-39, 67, 83-84. And more importantly, Schmitz misunderstands the term "multiplicitous." Under Eleventh Circuit precedent, "[an] indictment is multiplicitous if it charges a single offense in more than one count." *United States v. Howard*, 918 F.2d 1529, 1532 (11th Cir. 1990). Of course, where each offense requires proof of different facts, there is no multiplicity. *Blockburger v. United States*, 284 U.S. 299 (1932). Clearly that is the case at bar. Count one required proof of Schmitz's use of a computer connected to the internet to violate 18 U.S.C. § 2422(b), but count two required proof of a different fact: that she used a cellular phone to violate the same statute. The indictment was therefore not multiplicitous.

As yet another version of some of her other attacks on the superseding indictment, Schmitz asserts her counsel's ineffectiveness for failing to move for acquittal based on constructive amendments to the indictment: namely, that (1) the district court referenced the Alabama statutes that were violated when giving the jury instructions, even though they were not

included in the superseding indictment, and (2) the district court erroneously instructed the jury that Schmitz could be found guilty if it was proven that she used a computer <u>or</u> a cellular phone, rather than a computer <u>and</u> a cellular phone.[21]  Doc. 139-1 at 58-64.  As previously stated, there was nothing defective about the indictment, and even if there was, Schmitz has shown no prejudice.  This Court's recitation of three Alabama statutes (rape, sodomy, and sexual abuse) that criminalize adults having various forms of sexual contact with minors, does not amend the indictment.[22]  Rather, it merely explains to the jury one of the elements of a violation of § 2422(b): that if the sexual activity had occurred, the defendant would have been charged with a criminal offense under state law.  And Schmitz's parsing of the words "and" and "or" does not help her cause; she presents no legal basis as to why such a minor variance would make any difference.  Besides, the statement is true: the jury need only find that she used one of the two devices to establish guilt.  The jury would, however, have to find that she separately utilized the two different devices to establish guilt as to both counts.  This claim is truly frivolous.

---

[21]     Schmitz also attempts to make arguments concerning the broadening of the indictment's language from "cellular phone service" to "cellular phone" and the admission of evidence concerning grooming.  The grooming evidence has already been addressed.  Further, the "cellular phone" argument is undiscernable.

[22]     For whatever reason, Schmitz appears to bring up substantively the same issue in ground "MM," stating that "[t]here was no 'foundation in the evidence' to support notice of the sex acts of rape, sodomy, or sexual abuse, because there was no communication written by charlene_schmitz2007 where the author offered these acts to the minor or solicited these sex acts from the minor."  Doc. 139-1 at 65.  Schmitz once again misapprehends the law.  As the Eleventh Circuit has noted, "§ 2422(b) does not require the defendant to violate the underlying state statute to be convicted."  *United States v. Godwin*, No. 09-16015, 2010 WL 3910223, at *3 (11th Cir. Oct. 7, 2010); *United States v. Lee*, 603 F.3d 904, 914 (11th Cir. 2010) (the persuasion, not the sexual acts themselves is what is criminalized).

Neither should Schmitz's appellate counsel be held ineffective for failing to raise these issues on appeal. *See* Doc. 139-1 at 64-67. Counsel does not provide ineffective assistance when frivolous arguments are not raised on appeal, *Jones v. Barnes*, 463 U.S. 745 (1983); *see also United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (attorney not ineffective for failing to argue a meritless issue). Counsel may not be deemed ineffective for failing to raise an argument which is itself without merit; "it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance of counsel." *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994).

Accordingly, because the superseding indictment was not defective, because her counsel did, in fact, object to the indictment, and because she cannot demonstrate prejudice, her ineffective assistance of counsel claims that stem from the allegedly defective indictment should be denied. *See* Doc. 139-1 at 4-13, 29-35, 58-67.

3.      Alleged *Brady* Violation (Claim V)

Schmitz next alleges that the United States had possession of a video surveillance tape that proves that the minor victim was lying in a portion of his statements to state law enforcement officials. *See id.* at 13-15. Allegedly, the minor had stated, prior to trial, the time and place Schmitz and he had sexual contact, and this tape supposedly would prove that his statement was false. She argues that the United States failed to turn over this tape and that defense counsel's failure to file a motion to compel production of it was thus ineffective assistance of counsel. This is a plainly frivolous and unsupported assertion.

The United States never possessed any sort of surveillance tape. And if it had, the tape would have been immediately turned over to defense counsel. In fact, Schmitz's counsel

apparently did request these surveillance tapes, but neither the United States nor the District Attorney who initially investigated the underlying conduct had any such tapes. *See* Doc. 136, Ex. H, at 81 (AUSA responding to Schmitz's counsel, who requested "surveillance tapes and/or security video recordings" from Leroy High School, that "[t]hese tapes are not within the government's possession, custody or control. Further, I checked with District Attorney Spencer Walker. He noted that you had requested these tapes in your correspondence with him but that he does not have possession, custody or control of any such tapes either."). Second, the indictment does not allege nor require that any sexual contact occurred. Rather, the key to conviction was the coercion, inducement, or enticement of the minor to engage in prohibited sexual activity. The tape's contents, therefore, could not possibly have proven Schmitz's innocence, nor could it have been the basis for a motion to dismiss the indictment.

### 4. Suppression of the Internet Chats and Cell Phone Records (Claim W)

Schmitz next alleges that counsel was ineffective because he failed to move to suppress evidence obtained from the search and seizure of her computer and cellular telephone. *See* Doc. 139-1 at 16-17. This allegation is easily disposed of because Schmitz's counsel *did*, in fact, move to suppress evidence seized from Schmitz's home. *See* Doc. 17. This Court denied the motion. Doc. 21.

### 5. Failure to Object to Prosecutorial Misconduct (Claims X, Y, & Z)

Schmitz then, in a series of three claims, alleges that her counsel was ineffective for failing to object to various comments made by the prosecution. *See* Doc. 139-1 at 16-22. However, she fails to demonstrate why any of the named comments were improper.

First, she argues that the prosecution should not have asked a computer expert, on cross

examination no less, whether a particular computer at issue had been connected to the internet. *See id.* at 17. Then, she argues that the prosecution mischaracterized the content and nature of the internet chats in closing arguments. *See id.* at 17-18. Finally, she asserts that the prosecution used her post-*Miranda* silence to infer guilt, in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). *See id.* at 20-22.

Schmitz alleges that her counsel "failed to object or present evidence regarding the theory of defense that Schmitz's daughter, Tanya, was the individual communicating with A on the laptop, not Schmitz." *Id.* at 16. This assertion is false. It is unclear as to what evidence Schmitz is referring, but a substantial portion of the defense's case advanced the theory that Tanya was the one chatting with the victim. Tanya, herself, testified regarding this, and stated that it was she who was communicating with the victim, not her mother. *See* Tr. at 283-92. And the defense also called a computer expert who testified that it was possible for Tanya to use Schmitz's account to send instant messages. *See id*. at 224-26.

Schmitz then briefly argues that the AUSA somehow "misled" the jury (*see* Doc. 139-1 at 16-17) by simply inquiring, during cross-examination of the defense's computer expert, whether a particular computer was internet-connected at a particular point in time. *See id.* at 239. She fails to demonstrate how asking a simple and highly relevant question on cross-examination is prosecutorial misconduct, and also fails to show why her counsel should have objected to the question.

The next argument is that the AUSA "mischaracteriz[ed] the content of the chats in order to cause prejudice against Schmitz," and her counsel failed to object. *See* Doc. 139-1 at 17. Specifically, Schmitz alleges that in closing argument, the AUSA improperly infers that (1) Mike

Schmitz, the defendant's husband, gave conflicting testimony; and (2) there was evidence that Schmitz attempted to delete some of the instant messages between her and the victim. These scant allegations are meritless.

Schmitz misunderstands the role of closing argument. The offending comment that Schmitz refers to is, "The defendant's husband, the same man who said he didn't have a bag during the period of the chats when, in the chats it says, Mike has that bag." Tr. at 381. The relevance of this "bag" is that Mike had testified that he had been using a urostomy bag and had it put in place in August 2007, weeks after Schmitz was arrested. The instant messages between Schmitz and the victim refer to Mike having some type of "bag" in June 2007. *See* Gov. Ex. 3 at Sun. Jun. 3 16:13:45 2007. The AUSA is thus merely pointing out that inconsistency. Schmitz points out that, in her testimony at trial, she cleared up the inconsistency by explaining that Mike had one bag put in place "in late May or early June" for "two and a half or three days," (*see* Tr. at 318), then another one put in place in August 2007. *See id.* She points to no other evidence regarding this particular fact of trial, nor does she explain the relevance or prejudice stemming from the inconsistency. Though she may personally feel entitled that the jury only hear her version of events, by merely pointing out inconsistencies in the trial testimony the prosecutor was "commenting fairly on the evidence adduced at trial," and thus no misconduct occurred. *United States v. Rosin*, 263 F. App'x 16, 25 (11th Cir. 2008) (unpublished).

The next allegation – that the AUSA improperly commented that "You have heard that some of the text were deleted" (Tr. at 359), when there was no such evidence – is plainly false. While there was testimony that it was possible that the instant messages (at least the ones on Schmitz's computer) were automatically deleted, there was certainly evidence presented that the

chats were deliberately deleted. *See* Gov. Ex. 3 at Sat Jun 02 00:41:45 2007. The AUSA was once again merely commenting on evidence presented at trial, and there was nothing improper.

Similarly, Schmitz also briefly alludes to another purported misstatement of the evidence by the AUSA, arguing that because the AUSA did not quote the instant messages verbatim, she was deliberately misleading the jury. This reasoning is nonsensical. In the chats, Schmitz, as charlene_schmitz2007, communicated to the victim, using the screenname nickleback92, that she was thinking about "touching ur scruffy face and kissing my spot." *See id.* at Sat Jun 09 01:30:52 2007. The victim responded that he was "thinkin a sinful thought right now" about "wut I did wit my toung and yur place." *See id.* at Sat June 09 01:32:50 2007. In closing, the AUSA referenced this part of the chat logs with the comment "I would like to kiss your place." Tr. at 361. This reference is virtually identical to the evidence admitted at trial, and Schmitz does not coherently explain the prejudice she suffered as the result of this allegedly improper characterization of the evidence. Moreover, this Court instructed the jury that what the attorneys say in opening or closing statements is not evidence. Tr. at 354; *see United States v. Mock*, 523 F.3d 1299, 1302 (11th Cir. 2008) (the district court may rectify improper prosecutorial statements by instructing the jury that only the evidence in the case is to be considered). This allegation, like the spurious ones before it, is due to be rejected.

Finally, Schmitz would have this Court believe that the United States used her post-arrest but pre-trial silence to infer guilt, in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). She refers to the trial transcript at pages 326-27 to infer that the AUSA asked her several questions violative of *Doyle* without an objection from her attorney. This is simply an inaccurate portrayal of the record. On cross-examination, the AUSA engaged in the following exchange with Schmitz, after

her daughter, Tanya, testified that she – not Schmitz – authored the instant messages to the

victim:

> Q: Now, when did your daughter first tell you about these chats?
> A: After I was arrested in June.
> . . .
> Q: How did she tell you?  Mommy, I'm sorry?
> A: Well, she came to me and told me there was something that She thought she needed to tell me.
>
> Q: What did she tell you?
> A: That she had been on the computer under my name talking to Devin.
> . . .
> Q: So you immediately took her to the police, right?
> A: I did not.
>
> Q: You did not?  That would have exonerated you, right?
> A: I don't know if it would have or not.
>
> Q: And you took it to the DA?
> A: No, ma'am.
>
> Q: Because that would have exonerated you, right?
> A: I do not know.

Tr. at 325-27.  None of these questions violates *Doyle.*

In *Doyle*, the Supreme Court held that "it would be fundamentally unfair and a

deprivation of due process" to allow a Mirandized <u>defendant's</u> silence at the time of arrest to be

used to impeach his exculpatory testimony proffered for the first time at his criminal trial.  426

U.S. at 618 (emphasis added).  The AUSA's questioning did nothing to impeach the defendant

with her own silence.  Rather, it merely inquired as to why her daughter, Tanya, was never

allowed to convey <u>her</u> story to authorities.  Schmitz, of course, was under no obligation to speak

about the case.  But she cannot use her own right to remain silent and apply it to another person.

*See Doyle*, 426 U.S. at 617 (*Miranda* warnings are "a prophylactic means of safeguarding Fifth

Amendment rights"); *United States v. Goodwin*, 470 F.2d 893, 902 (5th Cir. 1972) ("The Fifth Amendment privilege to decline to testify is said to be personal to the witness"). The AUSA never commented on Schmitz's silence. Rather, Schmitz is attempting to take her own right to remain silent and superimpose it upon her daughter. This has no basis in law, and thus her counsel cannot be held ineffective for failure to object to this line of questioning. The claim is therefore due to be denied.

      6.      Inadmissible Hearsay Entered Into Evidence (Claims AA & BB)

In section "AA" and "BB," Schmitz argues that her counsel was ineffective by failing to object to the admission of the chat logs between Schmitz and the victim because they were hearsay evidence that was unauthenticated by the victim when he testified at trial. She fails to realize, however, that the chats were admissible pursuant to the business records rule, Fed. R. Ev. 803(6), as well as Rule 901(4). *See United States v. Sanchez*, 586 F.3d 918, 929 (11th Cir. 2009) (cell phone records, for instance, are business records within the meaning of the rule and thus satisfy an exception to the hearsay rule); *see also* Fed. R. Evid. 901(4). And the United States submitted the affidavit of the custodian of records for Yahoo! Inc., certifying the registration of the screennames in the chats to both Schmitz and the victim. The United States further elicited testimony of Gus Dimitrelos, an expert in forensic analysis, who stated that he was able to recover chats between those two user names from the victim's computer. *See* Tr. at 134; Gov. Ex. 3. The victim likewise testified that he would use the Yahoo! service to chat with Schmitz, and he also testified that he had read the chats, and that they were consistent with what the two had previously either done or talked about in person. *See* Tr. at 34-40.

In addition, the portions of the chat which represent Schmitz's writings are admissible as an admission of a party-opponent, under Fed. R. Evid. 801(d)(2). *See United States v. Rieara*, 381 F. App'x 928, 932 n.5 (11th Cir. 2010) (unpublished) (a defendant's "own statements were not hearsay because they were admissions by a party-opponent"); *see also United States v. Bert*, 495 F.3d 733, 738 (7th Cir. 2007). And the portions which represent the writings of the victim were not only implicitly acknowledged by the victim during his testimony, Tr. at 34-40, but even if they were not, their admission was not for the truth of the matters asserted. After all, "[t]he government had no reason to prove the particular sexual activities that [Schmitz] engaged in," *see Bert*, 495 F.3d at 739, but was rather using the victim's writings to place Schmitz's comments in context, and the conversations are therefore admissible *in toto*. *See United States v. Makarenkov*, No. 09-16373, 2010 WL 4204637, at *2 (11th Cir. Oct. 26, 2010) (citing *United States v. Price*, 792 F.2d 994, 997 (11th Cir. 1986)). Moreover, "other circuits have concluded that properly authenticated chat logs may be admitted in evidence." *Bert*, 495 F.3d at 738 (citing, e.g., *United States v. Tank*, 200 F.3d 627 (9th Cir. 2000); *United States v. Simpson*, 152 F.3d 1241 (10th Cir.1998)). Accordingly, because the law would have been squarely against Schmitz, her counsel could not have been ineffective for failing to object to the admission of the instant messages.

### 7. Dr. Atara's Testimony (Claims CC & KK)

Schmitz alleges in two separate sub-claims, "CC" and "KK" that her attorney should have objected to the testimony of the United States's witness, Dr. Catalina Atara, as irrelevant and as violative of Federal Rules of Evidence 403 and 702, and that he should have requested a *Daubert* hearing. Fed. R. Evid. 403 provides that "evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) The testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Dr. Atara testified as an expert in child sexual abuse and specifically the grooming process that often proceeds it. She did not testify that Schmitz was grooming the victim but, rather, testified generally as to the grooming process, and what is typically characteristic of it. Schmitz does not argue that Dr. Atara was not a qualified expert, nor that the testimony was based upon inadequate data, priciples, or methods. Rather, she argues that the testimony was highly prejudicial and wholly irrelevant because "sexual abuse" and "coercion and enticement" involve separate criminal intents.

Schmitz totally confuses the issue. Dr. Atara did not testify as to the specific intent as to sexual abuse. Nor, for that matter, did she testify as to the specific intent required to prove coercion or enticement. Rather, she testified as to "the process by which an adult establishes a . . . special relationship with the child that sets up a situation that leads to the potential for sexual abuse." Tr. at 185. As Dr. Atara noted, "the idea behind the grooming is it sets a stage where physical force is not needed for an adult to engage in sexual behavior with a child because they have established this special relationship where the child is going to do what the adult wants." *Id.* at 187. Dr. Arata's testimony was highly relevant so that the jury could decide whether Schmitz's conduct, through her texts and instant messages, fit into the typical grooming context.

The answer to this question would assist the jury in concluding whether Schmitz did, indeed, coerce or entice the victim to engage in sexual activity. Never did Dr. Atara testify as to the ultimate issue of trial – whether Schmitz's communications to the victim constituted enducement or inticement. This was left, properly so, in the province of the jury. This expert testimony was plainly admissible.

While her counsel might have requested a *Daubert* hearing to determine the testimony's admissibility, Schmitz points to nothing factually or legally that demonstrates that such a hearing would have excluded Dr. Atara's testimony. Indeed, Schmitz's attorneys did raise their concerns with the district court prior to the testimony, and the judge ensured that Dr. Atara did not go into Schmitz's mental state and merely testified as to the *modus operandi* of child predators in general. Nothing more would have been accomplished at a full hearing. And most importantly, because this testimony was properly held admissible, Schmitz fails to demonstrate prejudice. This claim is therefore due to be denied.

8.      Failure to Properly Request Limiting Instruction (Claim FF)

As part of her litany of alleged abuses, Schmitz next asserts that her counsel was ineffective for "opening the door about her prior state arrest . . . and not advising the court her arrest for tampering with a witness has been caused by his own unethical advice." Doc. 139-1 at 35. It is unclear just what sort of claim Schmitz is attempting to raise under this heading. Apparently, she is arguing that her attorney actually advised her to commit conduct which is illegal under state law, and that he therefore should have explained to this Court that it was his advice that was the underlying cause of Schmitz's state arrest. It seems highly unlikely that this sort of explanation in open court at trial would have benefitted Schmitz. What is clear, however,

is that her counsel did, in fact, request a limiting instruction regarding the testimony about which she complains. And counsel was successful, *see* Tr. at 80; therefore, there can be no prejudice as to this claim.

9.      Failure to Raise the Appellate AUSA's "Misrepresentation" on Appeal (Claim GG)

Schmitz's next claim is truly bizarre: she claims that the AUSA representing the United States on direct appeal intentionally represented to the Eleventh Circuit that (1) Schmitz went to trial on the original indictment, rather than on the superseding indictment, and (2) this Court used Pattern Jury Instructions No. 80, rather than the modified instructions "as requested by [her counsel]." Doc. 139-1 at 40. She claims that her counsel's failure to identify these so-called "misrepresentations" in the appellate reply brief constituted ineffective assistance of counsel.

These assertions are not only inaccurate, but are also truly irresponsible. First, there was no claim that this Court used only Pattern Jury Instructions. Rather, the response brief merely cites the elements of § 2422(b) as given in the Eleventh Circuit Pattern Jury Instruction, because that portion *was* used by this Court. Second, while the response brief failed to mention the superseding indictment, this was not some sort of unethical maneuver to "change the charges" against Schmitz after the fact. *See* Doc. 139-1 at 39. Rather, it was obviously an honest omission: one that would never have been lost on the Circuit Court, because it has full access to the district court docket, including documents such as the superseding indictment. Third, and finally, there was no prejudice demonstrated by her counsel's failure to point these two facts out

to the Circuit Court.  This dubious claim is thus due to be denied.[23]

          10.     Failure to Object to Sentencing Enhancement (Claim HH)

Schmitz's next claim is quite confusing.  She apparently claims that her attorney was ineffective for failing to move this Court to correct her presentence investigation report ("PSI") once it declined to apply a particular two-point enhancement.  But she admits that her attorney did, indeed, (1) object to the enhancement; and (2) this Court declined to impose the enhancement.  *See* Doc. 139-1 at 43.  It seems, however, that her concern is that her attorney has not "corrected" the PSI that she claims, even now, reflects the enhancement, and that she is prejudiced by the PSI, as it is used to determine "inmate eligibility for prison programs."  *Id.*

Schmitz does not understand that this Court, not the PSI, determines the ultimate guidelines range.  And she does not explain how her attorney could have done anything more at sentencing to "correct" her PSI.  As she admits, he objected to the enhancement that she complains of, and this Court refused to apply the enhancement to lengthen the sentencing guidelines applicable to her sentence.  Whatever this claim is asserting, it cannot be ineffective assistance of counsel.  And, besides, whatever one wants to call this particular challenge, it is not properly brought in a habeas proceeding.  *Mamone v. United States*, 559 F.3d 1209, 1211 (11th Cir. 2009) (the language of section 2255 limits its application to "a prisoner in custody . . . claiming the right to be released.").  This claim is likewise due to be denied.

---

[23]     Schmitz also alleges as claim "JJ" that her counsel was ineffective for choosing to raise the sufficiency of the evidence on appeal, rather than one of these other claims that she mentions in her § 2255 briefing.  To the extent that the United States demonstrates in the rest of its response that Schmitz's § 2255 claims are meritless, this conclusory claim is, as well.

11.     Failure to Object to Mandatory Restitution Order (Claim II)

Mandatory restitution was ordered in this case.  Schmitz argues that defense counsel's

failure to object to the restitution order constitutes ineffective assistance of counsel.  This

particular challenge is foreclosed by this Circuit's case law.  *See Arnaiz v. Warden, Fed. Satellite

Low*, 594 F.3d 1326, 1327-30 (11th Cir. 2010) (petitioner may not challenge the effectiveness of

his counsel for failure to object to restitution order); *see also Mamone*, 559 F.3d at 1211(the

language of section 2255 limits its application to "a prisoner in custody . . . claiming the right to

be released.").  Resultantly, this claim is due to be denied.

12.     Counsel Provided Privileged Communication to the Prosecution (Claim
        NN)

The final claim of ineffective assistance of counsel is that defense counsel was ineffective

because he allegedly disclosed privileged information to the prosecution.  Specifically, Schmitz

tells the story of her creating a calendar encompassing the events at issue in the case, and that she

did so in preparation of her defense.  This calendar was then disclosed by her attorney to the

United States, which, Schmitz alleges, then used the calendar as a basis to file the superseding

indictment, and used it as a basis to "get the testimony of Dr. Catalina Atara," among other

things.  *See* Doc. 139-1 at 71-73.  The rest of this claim explains other irrelevant material, such as

how much Schmitz paid her attorney, how she is having problems settling final payment with her

attorney, and various disparaging comments about the victim.  *See id.*

It is unclear how the disclosure of this "calendar," prejudiced Schmitz.  It is truly

preposterous that she believes that any such calendar could be used as a basis to call an expert

witness or to file a superseding indictment.  Rather, it appears that Schmitz and her attorney have

an on-going conflict.  Habeas proceedings are not the place to solve such issues, however.[24]

Regardless, she fails to demonstrate prejudice with any degree of specificity, beyond conclusory

and unsupported allegations, and this claim is therefore also due to be denied.

## V.       CONCLUSION

While the United States is mindful of the liberal *pro se* pleading standards, *Aron v.*

*United States*, 291 F.3d 708, 715 (11th Cir. 2002), even under the most liberal pleading

standards, allegations that are "wholly conclusory and unsupported by factual allegations or

proof" are due to be summarily denied.    *United States v. Jones*, 614 F.2d 80, 82 (5th Cir.), *cert.*

*denied*, 446 U.S. 945 (1980).  "Conclusory" and "unsupported" are perhaps the most pertinent

words to describe the vast majority of these allegations, and these grounds are therefore due to be

denied, as they either are demonstrably meritless or lack sufficient specificity for resolution.  In

sum, nearly all of Schmitz's complaints stem not from the misconduct of the prosecution team,

nor from judicial misconduct, nor from ineffective assistance of counsel.  They instead originate

with her belief that the court, the jury, and the prosecution should have believed her testimony

and version of events rather than the overwhelming evidence that pointed to her guilt.  This belief

is mistaken.

Because Schmitz's claims are without merit, her motion is due to be denied, as set forth

above.  Furthermore, under the circumstances, no evidentiary hearing is necessary, as the claims

are "patently frivolous," *Aron v. United States*, 291 F.3d 708, 715 (11th Cir. 2002), and capable

---

[24]       Donald Briskman represented Schmitz at trial and on appeal.  He has over twenty years' experience practicing criminal law in this district.  Whatever issue Schmitz is presenting in this claim is most likely mischaracterized.

of resolution based on the existing record. *Schultz v. Wainwright*, 701 F.2d 900, 901 (11th Cir. 1983).

Respectfully submitted,

KENYEN R. BROWN
UNITED STATES ATTORNEY

By:

s/Christopher B. Brinson
Christopher B. Brinson
Assistant United States Attorney
United States Attorney's Office
63 South Royal Street, Suite 600
Mobile, Alabama 36602
Telephone: (251) 441-5845
Fax: (251) 441-5131
E-mail: christopher.brinson2@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on January 10, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to any counsel of record, as well as defendant at her last known address: c/o #10084-003, FCI Tallahassee, 501 Capital Circle, NE, Tallahassee, Florida 32301.

s/Christopher B. Brinson
Christopher B. Brinson
Assistant United States Attorney
